UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ACTIVENGAGE, INC.,

    Plaintiff,

v.                                                            Case No. 6:19-cv-1638-Orl-37LRH

TODD L. SMITH,

    Defendant.
_____

## ORDER

This matter is before the Court on Plaintiff ActivEngage's Verified Motion for Preliminary Injunction (Doc. 9 ("**Motion**")); Defendant Todd L. Smith's response in opposition (Doc. 27); and Plaintiff's reply (Doc. 32). The Court held a hearing on the matter. (Doc. 34.) On review, the Motion is denied.

### I.     BACKGROUND

Ted Rubin ("**Rubin**") and Defendant Todd L. Smith ("**Smith**") co-founded ActivEngage in 2007, a company which provides messaging services, including live call, email, chat, texting, and advertisement services to car dealerships throughout North America. (Doc. 15-1, ¶¶ 3, 4; Doc. 28-1, ¶¶ 3, 19, 26.) For a while, their partnership was a good match. A rarity in the world of start-ups, ActivEngage not only survived but grew; managing an average of 10,000 dealership chats per day by 2011. (Doc. 28-1, ¶ 22.) And any tension between the co-founders over who controlled the company—Rubin and Smith had the same percentage of shares, but Rubin's family owned the other third—was

-1-

put aside to work together for over a decade. (*Id.* ¶¶ 23, 24, 31.) Rubin is the President, and Smith served as the CEO from 2007 until November 26, 2018. (Doc. 15-1, ¶¶ 2, 5; Doc. 28-1, ¶¶ 3, 25, p. 267.)

Starting in 2015, however, cracks began to show. Perhaps the first major warning sign was when Smith created his own company, 360Converge, a holding company for "new technological ideas." (Doc. 28-1, ¶¶ 29, 31.) But Smith insists he always presented ideas that could be of value to ActivEngage first. (*Id.* ¶ 31.) One such idea came in early 2018 when Smith began working on a new product, ActivProspect. (*Id.* ¶¶ 37–38.) As he conceptualized it, ActivProspect would be a "lead enhancement" product for dealerships. (*Id.* ¶¶ 32–36.)

Smith made some progress on ActivProspect during his time at ActivEngage. Smith met with a representative from Clarivoy, a company that could provide enhanced data for ActivEngage leads (*id.* ¶¶ 37, 39), but this partnership ended after failed test runs and Clarivoy's refusal to commit funds to developing ActivProspect. (*Id.* ¶¶ 58, 59; Doc. 29-1, pp. 22:21–25, 24:4–7.) Smith also met with TEEPS, an application development company, and provided TEEPS with examples of mobile applications in the market as models for ActivProspect's layout. (Doc. 28-1, ¶¶ 41, 44–46; Doc. 28-6, ¶¶ 3, 5.) ActivEngage hired TEEPS to develop ActivProspect into a mobile application, with a retainer of $10,000 per month. (Doc. 15-1, ¶¶ 22, 27.) TEEPS created a timeline, estimate of costs, and mockups for ActivProspect. (*Id.* ¶ 24, pp. 14–21.) And then the cracks got wider. Smith terminated TEEPS's contract in August 2018. (Doc. 28-1, ¶ 69.) This, he claims, was at the direction of Rubin. (*Id.*) Rubin says Smith acted unilaterally. (Doc. 15-

1, ¶¶ 30, 31; Doc. 26, pp. 131:23–132:10.) TEEPS did not write code or develop software for ActivProspect. (Doc. 28-6, ¶ 8.)

Smith continued to push for ActivProspect. Externally, he met with people outside ActivEngage to pitch ActivProspect. (Doc. 28-1, ¶¶ 51–52, 54.) Smith never required anyone to sign non-disclosure agreements at these meetings, but explains agreements weren't necessary since the concept was already in the market. (*Id*.) Internally, ActivEngage's marketing department prepared presentations for ActivProspect (Doc. 15-1, ¶ 21), and the Chief Financial Officer, David Zinn ("**Zinn**"), created a revenue model from discussions with Smith (Doc. 15-7, ¶¶ 2–11). In July 2018, Smith asked ActivEngage graphic designer, Alan Parker ("**Parker**"), to improve mockups for ActivProspect that TEEPS created. (Doc. 15-3, ¶ 5; Doc. 28-1, ¶ 56.) Parker also created video animation presentations and an investor deck for ActivProspect. (Doc. 15-3, ¶¶ 7–9.)

At this point, the co-founders' relationship began to crumble. In August 2018, Smith alleges, Rubin instructed the ActivEngage executive team to stop working on ActivProspect. (Doc. 28-1, ¶ 69.) To Smith, this was the wrong decision. ActivEngage needed to grow as competitors were entering the market. (*See id.* ¶¶ 36, 69, 70.) Smith told Michael Third ("**Third**"), the Vice President of Technology and Development, that ActivEngage did not have the funding or resources to keep working on ActivProspect. (Doc. 29-1, pp. 6:4–5, 18:7–18.) So Smith directed Parker to stop working on ActivProspect but paid Parker to re-brand the ActivProspect mockups with a new name—360Prospect. (Doc. 15-3, ¶¶ 11, 12.) Smith paid Parker on the side, outside his employment with ActivEngage. (*Id.* ¶ 13, 14.) This re-branded work was never presented to an outside

investor or dealership. (Doc. 28-1, ¶ 71.)

Rubin and Smith's relationship finally collapsed as they adamantly disagreed over the future direction of the company, with Smith advocating for investing in new technology, like ActivProspect, and Rubin pushing to expand ActivEngage's existing chat service. (*Id.* ¶¶ 62–65, 72.) Smith began working from home, feeling that his opinions no longer had any value at ActivEngage. (*Id.* ¶ 64.) An October 2018 meeting with the investors was the final blow. The consensus at the investors meeting was to sell the company quickly and not invest in any new technology. (*Id.* ¶ 73; Doc. 26-2; *see also* Doc. 28-7, p. 24:3–19.) The meeting minutes state, "November we will go dark in creating anything new." (Doc. 26-2, p. 4.) Unwilling to give up, Smith made last minute calls to Rubin and Rubin's cousin (an ActivEngage board member), Clifford Stein ("**Stein**"), urging them to reconsider. (Doc. 28-1, ¶¶ 74, 75.)

Shortly after, on November 12, 2018, Stein told Smith he was off the ActivEngage payroll but could work as an independent contractor to the company and build technology outside ActivEngage. (*Id.* ¶ 74; Doc. 28-7, pp. 11:5–6, 58:6–21.) Smith responded that he didn't have a non-competition agreement, which Stein acknowledged. (Doc. 28-1, ¶ 74.) Two weeks later, Smith was unceremoniously terminated. (Doc. 15-1, ¶ 36; Doc. 28-1, ¶ 75.) After his termination, ActivEngage sent Smith a proposed separation agreement with non-competition clauses that Smith never signed. (Doc. 28-1, ¶ 76.) Smith resigned from the Board but continues to hold a third of the stock. (Doc. 15-1, ¶¶ 38–40.) After his termination, as ActivEngage told him he could, Smith began developing new technology. (*See* Doc. 28-1, ¶ 74; Doc. 28-7, pp. 11:5–6, 58:6–21.) Smith worked on a

customer relationship management platform ("**CRM**")[1] for his company, 360Converge. (Doc. 28-1, ¶¶ 2, 78.) Rubin discovered that Smith was planning to release a product similar to ActivProspect in December 2018. (Doc. 15-1, ¶ 37.) Smith challenges the similarity to ActivProspect claiming his product does not handle any lead generation. (Doc. 28-1, ¶ 79.)

On January 23, 2019, ActivEngage sued Smith in state court. (Doc. 2-4, p. 2.) ActivEngage moved for preliminary injunction on February 19, 2019. (*Id.*) After ActivEngage amended its complaint (*see* Doc. 2-1), Smith removed the action here (Doc. 2). ActivEngage is suing for breach of fiduciary duty and violations of the Florida Uniform Trade Secrets Act ("**FUTSA**") and the Defend Trade Secrets Act ("**DTSA**"). (Doc. 2-1.) Around the time this case was removed, in August 2019, Rubin and Carol Marshall ("**Marshall**"), ActivEngage's Vice President of Operations, attended the Digital Dealer Conference. (Doc. 15-1, ¶¶ 41–43.) 360Converge presented at this conference, and Marshall took photographs of mockups that greatly resemble ActivProspect's mockups. (*Id.* ¶¶ 41–43, pp. 23–31.) On September 13, 2019, Zinn attended the Venture Central Florida Investor Showcase where 360Converge discussed a revenue model with a "noticeable resemblance to the ActivProspect revenue model." (Doc. 15-7, ¶¶ 14–25.) Now ActivEngage moves for a preliminary injunction to enjoin Smith from pursuing

---

[1] Customer Relationship Management platforms track information about customers throughout their time with a company, collecting information and helping facilitate relationships with these customers. (Doc. 28-1, ¶¶ 2, 5.) Some CRMs also include lead generation (finding potential customers) and lead enhancement (adding helpful information about the potential customer). (*Id.* ¶¶ 5, 6.)

360Prospect, which ActivEngage alleges comes from the misappropriation of ActivProspect. (Doc. 9.) With Smith's response (Doc. 27) and ActivEngage's reply (Doc. 32), the Motion is ripe.

## II. LEGAL STANDARDS

A district court may issue a preliminary injunction when the movant shows: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). Preliminary injunctions are "drastic" and "extraordinary" remedies, not to be issued unless the movant has "clearly established" the burden of persuasion on each element. *Id.* at 1210 (citation omitted). They are the exception, not the rule. *Id*.

## III. ANALYSIS

On review, ActivEngage has not shown the extraordinary remedy of preliminary injunctive relief is warranted. ActivEngage has not established a substantial likelihood of success or irreparable injury warranting injunctive relief. This is why.[2]

### A. Substantial Likelihood of Success

---

[2] As ActivEngage must establish all four factors to receive a preliminary injunction, the Court need not address the remaining factors of injunctive relief. *See Four Seasons*, 320 F.3d at 1210.

ActivEngage argues it has a substantial likelihood of success because Smith misappropriated ActivEngage's trade secret, ActivProspect, violating FUTSA and DTSA and breaching Smith's fiduciary duty. (Doc. 9, p. 6.) But Smith says ActivProspect is not a trade secret and even if it was, he didn't misappropriate it. (Doc. 27, pp. 8–16.) Since the central allegation is the claim of misappropriation of a trade secret, let's review the elements.

Under FUTSA, ActivEngage must prove "(1) [it] possessed secret information and took reasonable steps to protect its secrecy and (2) the secret it possessed was misappropriated." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006) (citations omitted). Similarly, under DTSA, ActivEngage must show (1) it possessed information of independent economic value it lawfully owned and for which it took reasonable measures to keep secret; and (2) Smith used or disclosed that information despite a duty to maintain its secrecy. *See Primo Broodstock, Inc. v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29CM, 2017 WL 1502714, at *10–11 (M.D. Fla. Apr. 27, 2017) (citing 18 U.S.C. § 1839(3)). FUTSA and DTSA can be analyzed together. S*ee M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1353–54 (S.D. Fla. 2016). ActivEngage's last claim, breach of fiduciary duty, requires (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by that breach. *Border Collie Rescue, Inc.*, 418 F. Supp. 2d at 1342. Having established the elements, let's turn to the record.

1. **Trade Secret**

To know whether ActivProspect is a trade secret, ActivEngage must first describe with some particularity what it actually is. *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283,

1286 (S.D. Fla. 2010) (citing *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007)). The descriptions have not been altogether consistent. Sometimes referred to as a CRM, but on other occasions, not a CRM—something like a CRM but "different and unique." (*See* Doc. 2-1, ¶ 14, 15; Doc. 15-1, pp. 2–3; Doc. 26, pp. 7:2–8:9; Doc. 29-1, p. 19:4–10.) Smith says ActivProspect was never a CRM (Doc. 28-1, ¶ 50), but ActivEngage's Marketing Coordinator said he described it to her as a CRM in March 2018 (Doc. 15-8, ¶¶ 2, 6). This creates a hindsight problem. Features of ActivProspect that purportedly exist today may give the description some particularity—for example, ActivEngage says ActivProspect is "gamified"—but the relevant version of ActivProspect is the one that existed when Smith allegedly misappropriated it, before his termination, and the record doesn't show a "gamified" feature existed when Smith was at ActivEngage. (*See* Doc. 9, p. 7; Doc. 15-1, pp. 2–3.) This inconsistency demonstrates the basic problem of an inadequate description of the purported trade secret. What is ActivProspect? What did it actually do? Stripping away the corporate jargon, ActivEngage has not said. ActivProspect seems to be a concept for a mobile application that identifies customers and uses data to help dealerships connect with prospects and strategize sales. (*See* Doc. 15-8, p. 5.) Even assuming this description is accurate, it's difficult to assess if ActivProspect is a trade secret.

Under both FUTSA and DTSA, a trade secret is "information . . . that must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (citations omitted); *see also Primo Broodstock, Inc.*,

2017 WL 1502714, at *10–11. ActivEngage argues ActivProspect is a trade secret because it's unique, doesn't currently exist on the market, and ActivEngage took reasonable steps to protect ActivProspect's secrecy. (Doc. 9, pp. 7–8.) Smith counters that ActivProspect is not a trade secret because it is composed of parts known in the industry, is not a unique combination of those parts, does not derive economic value, and was not subject to reasonable efforts to protect its secrecy. (Doc. 27, pp. 11–15.)

ActivProspect combines features that already exist on the market (*see* Doc. 26, p. 19:1–18), which can be a trade secret if the combination is unique. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1291 (11th Cir. 2003); *see also Xtec, Inc. v. Cardsmart Techs., Inc.*, No. 11-22866-CIV-ROSENBAUM, 2014 WL 10268426, at *7–8 (S.D. Fla. May 15, 2014) (citation omitted) (explaining a unique combination of software can be a trade secret even if individual components are known in the market); *Brigham Young Univ. v. Pfizer, Inc.*, 861 F. Supp. 2d 1320, 1323–24 (D. Utah 2012) (finding that a trade secret "can be made up of known elements, if the combination itself is . . . not readily ascertainable by proper means"). ActivEngage claims ActivProspect is unique because it is a "mobile-centric application for dealership personnel to use to navigate their daily workflow." (Doc. 9, p. 8.) But a review of products identified by Smith reveals this is not so unique. *See Living Color Enters., Inc. v. CMN Plastics Inc.*, No. 09-60459-CIV, 2009 WL 10668669, at *7 (S.D. Fla. Apr. 15, 2009) (finding that the plaintiff failed to establish trade secrets where process, or formulation close to the plaintiff's process, was used by others in the industry). There are multiple mobile applications on the market for dealerships to

manage their workflow.³ *See id.* ActivEngage has not shown that ActivProspect is a unique combination.

ActivProspect is a concept. But has this concept moved from an interesting idea to a legally protected trade secret? A concept doesn't need to be built to be protected, but the concept needs enough substance to be economically valuable and for a court to know what it's protecting. *See Backjoy Orthotics, LLC v. Forvic Int'l Inc.*, No. 6:14-cv-249-Orl-41TBS, 2015 WL 12915119, at *4 (M.D. Fla. July 28, 2015) (finding a trade secret where there were "drawings, photographs, molds, prototypes, and how-to instruction manuals"); *Sensormatic Elecs. Corp. v. TAG Co. U.S., LLC,* 632 F. Supp. 2d 1147, 1185 (S.D. Fla. 2008) (finding a trade secret where "specifications provide a detailed formula of mechanical and magnetic characteristics"); *ACR Elecs., Inc. v. DME Corp.*, No. 11-62591-CIV-MARRA, 2012 WL 13005955, at *5 (S.D. Fla. Oct. 31, 2012) (finding a trade secret in source code). Without code, an instruction manual, or details on how ActivProspect will work, this concept lacks the substance necessary to be a trade secret. All the component parts of ActivProspect exist on the market, multiple products like it exist, and there is no formula for how ActivProspect will function. Thus, ActivEngage has not met its burden to show ActivProspect derives economic value from not being readily ascertained by others, as required for a trade secret. *See Del Monte*, 136 F. Supp. 2d at 1291.

ActivEngage also argues the revenue model Zinn created is a trade secret. (*See* Doc.

---

³ *See* Reynolds & Reynolds, https://www.reyrey.com/solutions/digisalestm; Selly Automotive, https://www.sellyautomotive.com/integrations; VinSolutions, https://www.vinsolutions.com/dealership-software/connect-mobile; CarDog, https://www.cardog.com/our-solutions/.

32, p. 2.) While pricing information can constitute a trade secret under Florida law, ActivEngage has not shown, once again, how the ActivProspect revenue model derives economic value. *See VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) (citation omitted). Zinn based the revenue model off "baselines and assumptions" for the ActivProspect concept, leading to estimates. (Doc. 15-7.) ActivEngage has not established how this general revenue model could not be readily ascertained by others. *See Del Monte*, 136 F. Supp. 2d at 1291.

Also lacking are reasonable efforts to protect the secrecy of ActivProspect. *See Del Monte*, 136 F. Supp. 2d at 1291. ActivEngage claims its efforts include: only telling a small group of people about ActivProspect; telling those individuals not to disclose ActivProspect to third parties; having employees sign a handbook that requires them to return ActivEngage property upon termination; requiring shareholders to sign an agreement that they will not misappropriate trade secrets; and keeping documents about ActivProspect on a Google Drive that automatically locks. (Doc. 9, pp. 8–10; Doc. 15-1, ¶ 52.) Smith responds that in his decade of work at the company, he was never asked to sign the employee handbook upon which ActivEngage places such great weight, and he regularly talked to prospective investors about ActivProspect without non-disclosure agreements. (Doc. 27, pp. 14–15; Doc. 28-1, ¶ 76.) Smith also points out ActivEngage filed the ActivProspect investor deck on a public docket, which is hardly what one would do when trying to keep a secret. (Doc. 27, pp. 14–15.) ActivEngage has simply not shown it made reasonable efforts to keep ActivProspect secret. Thus, ActivEngage has failed to establish that ActivProspect is a trade secret.

### 2. Misappropriation

Even if ActivProspect is a trade secret, ActivEngage has not shown Smith misappropriated it. Misappropriation is the "use of a trade secret of another without express or implied consent by a person who [a]t the time of disclosure, knew or had reason to know that her or his knowledge of the trade secret was [a]quired under circumstances giving rise to a duty to maintain its secrecy or limited use." Fla. Stat. § 688.002(2)(b)2.b. ActivEngage argues Smith misappropriated ActivProspect by "disclosing ActivProspect to Mike McFall and possibly others at 360Converge" and "using ActivProspect-related information to compete with ActivEngage through 360Converge." (Doc. 9, p. 10.) Smith responds that ActivEngage has failed to put forth sufficient evidence of this alleged misappropriation. (Doc. 27, pp. 15–16.) The Court agrees with Smith.

ActivEngage provided the following evidence of misappropriation: Smith asked Parker to re-brand ActivProspect material with the 360Prospect logo (*see* Docs. 15-3–15-6); Smith created his own company, 360Converge, and will release a product with it (*see* Doc. 15-1, ¶¶ 41–43, pp. 23–31; Doc. 15-7, ¶¶ 14–25); and 360Converge presented at two conferences with a similar design to the TEEPS and Parker mockups and similar revenue model created by Zinn (*see* Doc. 15-1, ¶¶ 41–43, pp. 23–31; Doc. 15-7, ¶¶ 14–25). If this case was about misappropriated artwork, ActivEngage would have a much stronger argument. But it's not. Smith clearly re-branded graphics paid for by ActivEngage, but ActivEngage is seeking relief for the theft of ActivProspect, the *concept* not the re-branded artwork. (*See* Doc. 9.) As for the concept, ActivEngage has not provided evidence that

Smith told anyone at 360Converge about ActivProspect, and Smith explained in detail how ActivProspect and 360Converge's product are different. (*See* Doc. 28-1, pp. 17–22); *see also Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV-GOODMAN, 2017 WL 532299, at * 4 (S.D. Fla. Feb. 9, 2017) (finding that suspicion without actual evidence is insufficient for a preliminary injunction). Third acknowledged a CRM, like Smith's product, does not compete against ActivProspect. (Doc. 28-1, ¶ 78; Doc. 28-2, p. 36:22–24.) No doubt Smith used his time at ActivEngage to help build his company, but Smith "is free to draw upon his general knowledge, experience, memory and skill, howsoever gained, provided he does not use, disclose, impinge upon any of the secret processes or business secrets of his former employer." *Cataphote Corp. v. Hudston*, 422 F.2d 1290, 1295 (5th Cir. 1970).[4] That is exactly what happened here. Smith only developed his own product after ActivEngage refused to put resources into moving forward with ActivProspect. (*See* Doc. 28-1, ¶¶ 2, 62–65, 73, 78.) Now ActivEngage may have regrets, like asking Smith to sign a non-competition agreement only *after* it terminated him. (*See* Doc. 28-1, ¶ 76.) But it is not enough for ActivEngage to allege, without a non-competition agreement, that Smith is working for a competing business now. *See SCICRIP, Inc. v. Engineered Bonding Sols., LLC*, No. 6:15-cv-65-Orl-22KRS, 2015 WL 13792807, at *4 (M.D.

---

[4] The parties don't dispute whether ActivEngage owns ActivProspect, and the Court assumes it does for this Motion but notes the law must balance "an individual's right to exploit his own skill and knowledge" and "reasonable protection [for businesses] against unfair trade practices." *Cataphote Corp.*, 422 F.2d at 1295. The decisions of the former Fifth Circuit rendered before October 1, 1981 are binding on this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Fla. Dec. 9, 2015) (citations omitted). Has Smith appropriated ActivProspect? Yes. Has he misappropriated it? ActivEngage hasn't shown.

## B. Irreparable Injury

To warrant a preliminary injunction, ActivEngage must show it will suffer irreparable injury unless the injunction issues. *See Four Seasons*, 320 F.3d at 1210. It has not made this showing. "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). ActivEngage alleges it will suffer irreparable injury because: (1) the misappropriation will continue to increase ActivEngage's damages; (2) ActivProspect is the next generation software for ActivEngage and must be first to market; and (3) ActivEngage will lose goodwill among its customers who will associate ActivEngage technology with ActivEngage's competitors. (Doc. 9, pp. 15–16.) Smith counters that ActivEngage's alleged injury is remote and speculative. (Doc. 27, p. 17.) ActivEngage has failed to show it will suffer irreparable harm without a preliminary injunction.

First, that ActivEngage's damages will increase over time does not warrant a preliminary injunction. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *N.E. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990). Just because ActivEngage's damages are increasing does not mean compensation can't come later. *See id.* ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the

ordinary course of litigation, weighs heavily against a claim of irreparable harm." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))).

Second, the Court is unpersuaded that ActivEngage has been pursuing ActivProspect and can be first to market. ActivEngage put a hold on developing new technology and was seeking to sell the company in October 2018. That fact is uncontroverted. (*See* Doc. 26-2; Doc. 28-1, ¶ 73; Doc. 28-7, p. 24:3–19; Doc. 26, pp. 144:21–152:24.) Michael Third explained that ActivEngage has not made progress on ActivProspect since September 2018. (Doc. 29-1, p. 18:3–6.) Although Rubin says parts of ActivProspect are available, there is no release date and no one on Third's team is working on it. (Doc. 26, pp. 8:16–9:16, 201:3–6; Doc. 29-1, pp. 17:25–18:2, 71:11–23.) There are multiple similar products to ActivProspect on the market. (*See* Doc. 28-1, ¶ 80.) Even if ActivEngage were to release ActivProspect tomorrow, which seems highly unlikely, it still would not be first to market because similar products already exist today. (*See id.*)

Last, ActivEngage contends the 360Converge product will cause it to lose goodwill among its customers, but the "injury must be actual and imminent not remote or speculative." *VAS Aero Services, LLC*, 860 F. Supp. 2d at 1362 (citing *N.E. Fla. Chapter*, 896 F.2d at 1285). ActivEngage hasn't shown any actual or imminent threat to its goodwill to support a claim of irreparable injury. *Cf. Gucci Am., Inc. v. 9goods.co*, No. 13-20146-CIV-ALTONAGA, 2013 WL 12101118, at *7 (S.D. Fla. Jan. 23, 2013) (finding the defendant's marks were similar enough to the plaintiff's marks to cause irreparable damage where customers would think it was the plaintiff's products in the marketplace); *Advice Interactive Grp., LLC v. Web.com Grp., Inc.*, No. 3:17-cv-801-J-39MCR, 2017 WL 6554409, at

*13 (M.D. Fla. Oct. 20, 2017) (finding irreparable harm where there was a "great possibility of market confusion"). ActivEngage has not established that any injury it has suffered or may suffer cannot be adequately compensated later. *See N.E. Fla. Chapter*, 896 F.2d at 1285.

ActivEngage has not shown a substantial likelihood of success on its claims or that it will suffer irreparable injury without a preliminary injunction. While ActivEngage "may very well prevail in the present action in the end," it has not met its burden to warrant a preliminary injunction. *Oce North Am., Inc. v. Caputo*, 416 F. Supp. 2d 1321, 1329 (S.D. Fla. 2006). Thus, the Motion is denied.

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiff ActivEngage's Verified Motion for Preliminary Injunction and Incorporated Memorandum of Law (Doc. 9) is **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on November 4, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record